# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 20-0674V

| | |
|---|---|
| CHARLES RICHARDSON,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: August 16, 2023 |

*Leigh Finfer*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Mallori Browne Openchowski*, U.S. Department of Justice, Washington, DC, for Respondent.

### **DECISION AWARDING DAMAGES**[1]

On June 3, 2020, Charles Richardson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine administered on October 28, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters. Although a ruling on entitlement in Petitioner's favor was issued in September 2021, the parties have been unable to resolve damages on their own. For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$112,000.00 for actual pain and suffering.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I. **Procedural History**

The Petition was accompanied by the medical records and affidavit required under the Vaccine Act. Exs. 1-8 (ECF No. 1); *see* Section 11(c). In June 2020, the record was deemed sufficiently complete, and the case was assigned to the SPU (OSM's adjudicatory system for resolution of cases deemed likely to settle). ECF No. 8.

In September 2021, a Ruling on Entitlement was issued, consistent with Respondent's concession (in his Rule 4(c) Report), that Petitioner had suffered a left-sided SIRVA meeting the Table and QAI criteria. ECF Nos. 25-26.

In April 2022, Petitioner filed updated medical records as Exs. 9-11, ECF No. 34, and forwarded a demand for Respondent's consideration, ECF No. 35. In June 2022, Petitioner withdrew a lost wages claim – thereby limiting his damages demand to pain and suffering. ECF No. 37. The parties reached an impasse in their efforts to informally resolve damages in September 2022, and thus briefed their respective positions. *See* ECF No. 39-40; Petitioner's Memorandum filed Nov. 10, 2022, ECF No. 41 (with embedded "Ex. A" – which is an unnotarized, unsworn, undated "impact statement" from Petitioner) ("Brief"); Respondent's Memorandum (with attached "Appendix A") filed Dec. 21, 2022, ECF No. 42 ("Response"); Petitioner's Memorandum filed Jan. 5, 2023, ECF No. 43 ("Reply"). The matter is now ripe for adjudication.

II. **Authority**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical

2

formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[3] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

I have periodically provided (in other published decisions) statistical data on pain and suffering for SIRVA claims resolved in SPU. *See, e.g.*, *McKenna v. Sec'y of Health & Human Servs.*, No. 21-0030V, 2023 WL 5045121, at *2-3 (Fed. Cl. Spec. Mstr. July 7,

---

[3] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

2023). As noted in *McKenna*, as of July 1, 2023, in 173 SPU SIRVA cases that required reasoned damages determinations, compensation for past pain and suffering ranged from $40,000.00 to $215,000.00. *Id.* at *3. Cases with higher pain and suffering awards involved prompt medical attention; high subjective pain ratings; moderate to severe limitations in range of motion; significant findings on MRI; surgery or significant conservative treatment; and evidence of permanent injury. *Id.* at *3.

### III.   Appropriate Compensation for Petitioner's Pain and Suffering

#### A.   Consideration of the Evidence

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult, with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. In performing this analysis, I have reviewed the record as a whole, including all medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I also have considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and I rely upon my experience adjudicating these cases. However, I base my ultimate determination on the specific circumstances of this case.

At the time of vaccination, Petitioner Charles Richardson was sixty-eight (68) years old and had a non-contributory medical history. *See generally* Ex. 2 at 64-87. He received the subject vaccine in his left arm on October 28, 2018. Ex. 1 at 1-3. No complaints or findings pertaining to the left shoulder were documented at a November 2, 2018, annual wellness appointment with his established primary care provider, Lindsay Olson, D.O.[4]; or at a November 8, 2018, follow-up appointment with an ENT specialist. Ex. 2 at 15-17, 62-63.

But thirteen (13) days post-vaccination, on November 10, 2018, Petitioner presented to Palos Hospital Urgent Care to address left shoulder pain. Ex. 7 at 9. Petitioner reported that approximately two weeks prior, he had received a flu shot. *Id.* There was no redness or swelling at the site, but "later that night, he felt pain and could not move his shoulder as well." *Id.* Stretching and Tylenol had not helped. *Id.* On physical exam, the left shoulder exhibited "decreased range of motion and pain," more specifically: "Pain with flexion up to 90 degrees. Pain with external rotation." *Id.* at 10. PA Kristina Hajek assessed "acute pain of left shoulder," for which she prescribed a Medrol

---

[4] The earlier primary care records list Petitioner's provider as Lindsay Multack, D.O. This appears to be the same individual, who changed her last name over the course of the records. To the extent that it is necessary to refer to the primary care provider, for consistency, this decision will identify her as Dr. Olson.

4

(methylprednisolone) dose pack and Tylenol-3 (acetaminophen-codeine) and provided a list of orthopedists to potentially consult if the pain did not improve. *Id.* at 11.

No complaints or findings pertaining to the left shoulder were documented upon a November 24, 2018, phone call from Petitioner to his primary care provider regarding a prescription refill for his preexisting gout. Ex. 2 at 12-14.

The next medical record is from December 10, 2018, and authored by Scott P. Price, M.D., at Parkview Orthopaedic Group. Ex. 5 at 5. Dr. Price recorded Petitioner's similar history of post-vaccination progressive left shoulder pain which was associated with activity, but also occurring at night. *Id.* The pain medication prescribed at urgent care had not helped. *Id.* A physical exam of the left shoulder revealed "minimally restricted" passive range of motion and "mildly positive impingements," and "pain and weakness of abduction with external rotation compared to internal rotation." *Id.* An X-ray revealed a small inferior glenoid spur and mild acromioclavicular degeneration. *Id.* Dr. Price prescribed Mobic and Norco, in addition to icing the shoulder. *Id.* at 6.

On December 12, 2018, Petitioner had an MRI of his left shoulder. Pet. Ex. 5 at 10-11. The findings included: mild acromioclavicular degenerative changes; supraspinatus and infraspinatus tendinosis with near full-thickness tear at the supraspinatus tendon insertion; partial tearing along the infraspinatus tendon insertion; superior and posterior labral tear; anterior and inferior labral tears; nonspecific marrow edema along the posterolateral humeral head; and mild subacromial/sub-deltoid bursal fluid. *Id.*

As of December 17, 2018, upon following up with Dr. Price, Petitioner was still having weakness, difficulty reaching overhead and behind his back, pain with certain activities, and pain at night. Ex. 5 at 12. Mobic delivered "minimal" change, but Norco "help[ed] with his pain." *Id.* Petitioner hoped to "get through the winter as he works for a snow removal company." *Id.* He would continue applying ice packs and taking Mobic; start physical therapy ("PT"); consider a steroid injection in several weeks; and "consider surgical repair in the spring." *Id.* at 13-14.

At the January 4, 2019, PT initial evaluation, Petitioner rated his pain on average 3/10, ranging from 0 – 5/10. Ex. 5 at 16. He was "thinking of going through surgery sooner if PT does not resolve his problem." *Id.* Based on his reported difficulties including with personal hygiene; household chores; recreational activities; work; and sleep, his shoulder function was rated at 40%. *Id.* On physical exam, the left shoulder had painful and limited active range of motion (abduction to 62 degrees; flexion to 90 degrees; external rotation to 55 degrees; internal rotation to L4), and weakness. *Id.* at 17. Drop arm, infraspinatus weakness, and empty can tests were positive. *Id.* at 18. The therapist aimed to prevent

5

adhesive changes in the joint, reduce pain, and restore range of motion and strength. Ex. 5 at 18; *see also id.* at 23-24, 25-26 (second and third PT sessions on January 8 and 11, 2018, with reports of continued "high pain levels").

On January 15, 2019, at his fourth PT session, Petitioner reported: "significant pain today – after 30 hours of driving a large snowplow over the weekend. He was very sore since then. He is feeling like he is going to need surgical repair." Ex. 5 at 27. Due to his pain, the therapist added electrical stimulation and a cold pack to the therapy regimen. *Id.* at 28. The therapist recorded: "Slow progress towards functional goals. Pain and weakness remain, though he has gained active shoulder ROM." *Id.*

On January 17, 2019, Petitioner obtained a second opinion from orthopedic surgeon Dane M. Salazar, M.D., at Loyola Medicine. Ex. 3 at 20. Dr. Salazar recorded a similar history of post-vaccination, persistent left shoulder pain, despite continued use of Mobic, currently rated at 7/10. *Id.* A physical exam found consistently decreased active range of motion (no measure of abduction; flexion to 90 degrees; external rotation to 65 degrees; internal rotation to the lumbosacral junction) and weakness. *Id.* at 20-21. Dr. Salazar instructed Petitioner to discontinue Mobic (meloxicam) in favor of Ultram (tramadol). *Id.* at 24. Dr. Salazar and Petitioner decided to proceed to arthroscopic surgery. *Id.* at 21. Accordingly, the PT course was suspended the following day. Ex. 5 at 30. Petitioner attended a pre-operative physical at his primary care practice on January 29, 2019. Ex. 2 at 7-11.[5]

On February 12, 2019, Dr. Salazar performed the planned arthroscopic surgery on Petitioner's left shoulder – specifically consisting of a rotator cuff repair, subacromial decompression and acromioplasty, and a mini-open subpectoral biceps tenodesis. Ex. 3 at 38-42. He was discharged with a shoulder sling to wear for six weeks, and a new prescription for Roxicodone (oxycodone) 5mg, to take one to two tablets every four to six hours as needed for pain. *Id.* at 113-14. Later that day, Petitioner reported that his pain rated 7/10. *Id.* at 43.

At a February 28, 2019, post-operative follow-up, Petitioner's pain had decreased to 4-5/10. Ex. 3 at 123. He was directed to follow a home exercise program and continue taking oxycodone as needed for pain. *Id.* at 123, 125. At the next post-operative follow-up on April 4, 2019, Petitioner's pain was "well-controlled with pain meds… currently taking about 1-2 oxycodone a day," and rated 4/10. Ex. 3 at 132-33. He had discontinued the sling but continued to comply with a 3-pound lifting restriction. *Id.* at 133. He would

---

[5] Of note, Petitioner has filed primary care records dating only through April 2019, *see generally* Ex. 2, with no further updates.

continue to ice, elevate, and take pain medication as needed, and start formal PT. *Id.* at 133.

On April 9, 2019, Petitioner presented to Athletico Physical Therapy to begin post-operative rehabilitation of his left shoulder. Ex. 6 at 99-103.[6] By mid-May 2019, Petitioner reported that "things [were] going well and [he] hope[d] to continue with PT at Athletico in Mokena as he is about 75% on his way to recovery." Ex. 3 at 144. His pain was "worst at night and when it rain[ed]." *Id.* However, he was only taking "one pain medicine at night to sleep… His pain ha[d] improved dramatically." *Id.* at 146. Dr. Salazar concurred that Petitioner was doing "exceptionally well," and removed the previous lifting restriction. Ex. 3 at 146; *see also* Ex. 6 at 63-99 (PT sessions).

July 15, 2019, marked the 27th and last post-operative PT session for Petitioner's left shoulder. Ex. 6 at 15. Physical exam documented full active range of motion (abduction and flexion to 165 degrees; external rotation to 90 degrees; internal rotation to 60 – equal to the opposite right shoulder), and nearly full strength (except for 4+/5 flexion). *Id.* at 16. Petitioner was pain-free except for "minor discomfort" upon reaching behind his back;[7] he had achieved all goals and had learned a home exercise program; and thus, was discharged from formal PT. *Id.* at 17.

On July 25, 2019, Dr. Salazar confirmed that Petitioner had "near full range of motion, normal strength, and no pain off all pain medicine." Ex. 3 at 155. He was discharged without any formal restrictions and could follow up as needed. *Id.*

The filed records thereafter reflect a *seventeen (17) month gap in any medical encounters* leading up to December 30, 2020, when Petitioner returned to his orthopedic surgeon Dr. Salazar. Ex.11 at 6. It was now reported that Petitioner's *left* shoulder "ha[d] been doing quite well," but Petitioner reported pain in the opposite *right* shoulder: "[s]tart[ing] in the spring, he noticed that he was chopping some wood, he has had progressive insidious onset pain. He has difficulty reaching, lifting away from his body, and sleeping on his side… Feels very much like his contralateral side prior to surgery." *Id.* Based on physical exam and X-ray imaging, Dr. Salazar assessed right shoulder rotator cuff tendinopathy, for which he administered a steroid injection. *Id.* at 6-7.

---

[6] The post-operative PT sessions occurred specifically on April 9, 11, 16, 18, 23, and 26; May 1, 3, 7, 10, 14, 17, 20, 21, 23, 28, and 30; June 4, 6, 10, 13, 20, 24, 25, and 27; and July 5, 11, and 15, 2019. *See generally* Ex. 6.

[7] "Reaching behind back" is abbreviated as "RBB" in the medical records. Ex. 6 at 15, 17.

A March 1, 2021, MRI of the right shoulder visualized a suspected full-thickness tear of the far anterior fibers of the supraspinatus tendon and partial thickness intrasubstance/ articular surface tears of the posterior supraspinatus and anterior supraspinatus tendons; a glenoid labral tear involving the superior labrum; acromioclavicular joint arthritis; and subacromial-subdeltoid bursitis. Ex. 10 at 355-56.

On March 17, 2021, Dr. Salazar reiterated that Petitioner's *left* shoulder "feels perfect. He is completely asymptomatic. He has no pain. Excellent range of motion… He has had an excellent result from his left shoulder arthroscopic rotator cuff repair [in February 2019]." Ex. 10 at 382-83. However, more recently, Petitioner's right shoulder "ha[d] become bothersome." *Id.* Dr. Salazar recommended arthroscopic surgery on the *right* shoulder – which he performed on June 1, 2021. Ex. 10 at 432-37; *see also id.* at 591, 614, 760 (initial post-operative orthopedics encounters).

On September 29, 2021, Dr. Salazar administered a second steroid injection to the right shoulder. Ex. 10 at 89-90. On October 28, 2021, Petitioner completed a post-operative formal PT at Loyola Medicine, and was discharged with a home exercise program for his right shoulder. *Id.* at 254-273. Dr. Salazar concluded his treatment of Petitioner's right shoulder on December 1, 2021. Ex. 10 at 283.

In addition to the medical records summarized above, Petitioner has submitted an "impact statement" (embedded in the Damages Brief, *see* ECF No. 41 at 10-12) that is undated[8] and not notarized (or sworn under penalty of perjury, which may be given "like force and effect, *see* 28 U.S.C.A. § 1746). He describes difficulty supporting his wife and two minor children; interruption of his winter job in 2019; and temporary dependence on the opioids prescribed after his surgery, prior to recovering "approximately 90% mobility of [his] left arm and shoulder." ECF No. 41 at 10-12. Petitioner also stated:

> Over the last few months, I have now been experiencing pain in my right shoulder after doing what used to be simple tasks around the house like trimming the bushes. I have always been a very fit and active person, and always loved doing things outdoors, including maintaining my yard. I cannot help but wonder if the pain I am now getting in the other shoulder is from overusing it to compensate for the loss of use and strength in my left shoulder?

ECF No. 41 at 12. Upon preparation of the impact statement, Petitioner was seeking an appointment with his doctor, but encountering scheduling difficulties due to the COVID-19 pandemic. *Id.*

---

[8] He states in it, however, that "it is now almost 2 years since I received the vaccination" – thus placing the statement's preparation at no later than October 2020.

8

### B. Analysis

Petitioner seeks $140,000.00 for his pain and suffering. Brief at 1. Respondent alternatively proposes a lesser award of $85,000.00. Response at 2.

The medical records (summarized above) reflect that Charles Richardson experienced acute pain in his left shoulder upon administration of the October 28, 2018, flu vaccine. The lack of documentation at two medical encounters – particularly the annual physical five days post-vaccination, less so the ENT encounter 11 days post-vaccination – and the subsequent medical records reflect that the initial pain was persistent, but mild to moderate. However, Tylenol and stretching did not help, and the pain progressed to feature decreased range of motion by the urgent care visit 13 days post-vaccination.

Petitioner continued to suffer mild to moderate pain (at worst, 5/10) despite various prescription pain medications (Tylenol-3, Mobic, Norco) and 4 initial PT sessions – until about two months post-vaccination, when the pain increased significantly, concurrent with "30 hours of driving a large snowplow over the weekend." This detail cuts both ways: supporting both the SIRVA's disruption to his livelihood, but also a potential independent stressor, further aggravating the existing SIRVA. That degree of pain necessitated the arthroscopic surgery 3.5 months post-vaccination. His initial post-surgical pain rated 7/10 and was managed with oxycodone – which he tapered down to just 1-2 tablets per day 2 months post-surgery. The medical records do not corroborate Petitioner's assertions of opioid dependency. He also underwent 27 post-operative PT sessions. Five and one-half months post-surgery, which was nine months post-vaccination, Petitioner was discharged from all formal treatment in excellent condition.

Petitioner cites *McDorman* for the proposition that an overuse injury in the *opposite* arm can be factored into the severity analysis and justify an increased award. Brief at 6 (citing *McDorman v. Sec'y of Health & Hum. Servs.*, No. 19-0814V, 2021 WL 5504698 (Fed. Cl. Spec. Mstr. Oct. 18, 2021). However, there is no evidence of that scenario occurring in this case, beyond Petitioner's own assertions. Otherwise, the record establishes that Petitioner's recovery of near if not full range of motion and strength in his left shoulder was followed by a 17-month gap, followed by a *new* complaint of right shoulder pain. At that time, his orthopedic surgeon Dr. Salazar confirmed that the left shoulder was "completely asymptomatic" and did not draw any connection between the two injuries, despite the common remedy of surgical intervention. Moreover, upon treating each injury, Dr. Salazar included patient reference material which provides:

> Most rotator cuff tears are age-related. There are changes in the quality of the tendon tissue as we age. As a result, by the age of 60, approximately 30% of people will have a tear that may or may not cause pain, and over

> 50% of people will have some abnormality of the rotator cuff… While most tears are age-related, some result from an injury…

Ex. 3 at 6; *see also* Ex. 10 at 389. Thus, although pathology in Petitioner's left shoulder was likely aggravated by the inflammatory reaction in and around the shoulder, described in the QAI for SIRVA (42 C.F.R. § 100.3(c)(10)), pathology in the non-vaccinated *right* shoulder most likely became symptomatic due to age and/or aggravating factors unrelated to the prior left SIRVA.

In making this finding, I give more weight to the records than to Petitioner's witness statement. Even though medical records can be supplemented by fact witness statements and representations, such statements must carry some indicia of reliability. *See* Section 11(c) (requiring Petitioner to submit an "affidavit"); *see also* 28 U.S.C.A. § 1746 (providing that an unsworn declaration made under penalty of perjury may be given "like force and effect" as an affidavit). Here, however, Petitioner's impact statement is unnotarized, unsworn, and undated – reducing its evidentiary weight from the outset.[9] I have given *some* consideration to Petitioner's assertions within the impact statement – but on key points, I find it unsupported or contradictory to the medical record evidence.

In support of his pain and suffering demand, Petitioner cites to *Wilson v. Sec'y of Health & Hum. Servs.*, No. 19-0035V, 2021 WL 1530731, at *4 (Fed. Cl. Spec. Mstr. March 18, 2021), in which $130,000.00 was awarded for actual pain and suffering. He emphasizes the *Wilson* petitioner's statement that her pain was "[was] not limiting her daily activities [or] compromising the quality of her lifestyle." Brief at 7. But that petitioner offered that characterization *before* her surgery, making it different from Mr. Richardson's characterization of his pain *after* surgery, particularly in the initial days. In addition, and as noted above, the medical records do not corroborate Petitioner's contention that he became dependent on the opioids prescribed for his post-surgical pain. Respondent also correctly notes that *Wilson* featured a recurrence of mild pain, range of motion, and positive impingement signs – which were accepted as "some residual and persisting symptoms of her SIRVA." Response at 11 (citing *Wilson*, 2021 WL 1530731 at *4). Mr. Richardson fortunately made an excellent recovery from his left-sided SIRVA (without sufficient linkage to his subsequent right shoulder injury). *Wilson* is therefore not a particularly helpful comparable case.

---

[9] As an administrative matter, embedding the impact statement within the Damages Brief also increases the likelihood that the impact statement will not be reviewed alongside the formal exhibits, rather than treating it as a separate exhibit.

Respondent makes several different arguments defending the lower sum he embraces. First, he suggests that it is mistaken to place an "undue premium" on the mere occurrence of arthroscopic surgery, leading to "automatic" award of at least $100,000.00 in SIRVA cases. Rather, he argues for reliance on proffers, and on pain and suffering determinations from traditional tort system state court cases (presented in his Appendix A. He also argues that the pain and suffering awards in the Program have become unreasonably inflated. But I have previously considered, and dispensed with, these arguments in at least one publicly available reasoned opinion. *See, e.g.*, *Gray v. Sec'y of Health & Hum. Servs.*, No. 20-1708V, 2022 WL 6957013, *5-6 (Fed. Cl. Spec. Mstr. Sept. 12, 2022). In short, the policy goals of the Vaccine Program are best served if outcomes in common cases (like SIRVA vaccine injury claims) are predictable and/or subject to some uniformity – and it has been my determination that surgery cases reasonably present a degree of unanticipated suffering justifying a six-figure award. (Otherwise, adjustments are always considered and made to account for the facts of each case, and in some instances even SIRVA surgery cases result in lower pain and suffering awards).

Second, Respondent contends that his proposed figure is consistent with comparable cases. *See,* e.g., *Clendaniel v. Sec'y of Health & Hum. Servs.*, No. 20-0213V, 2021 WL 4258775, at *8 (Fed. Cl. Spec. Mstr. Aug. 18, 2021) (awarding $60,000.00). *Clendaniel* featured two cortisone injections, two arthrocentesis procedures, and a longer duration of symptoms. But in *Clendaniel*, I stressed that the claimant's course was "not extensive or invasive" specifically because it did not involve surgery or any physical therapy – both present in Mr. Richardson's case.

Respondent also avers that Petitioner's pain and suffering was less severe, and therefore warrants a lower award, than two other cases that did involve surgery. Response at 8-9 (citing *Hunt v. Sec'y of Health & Hum. Servs.*, No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding $95,000.00 for actual pain and suffering); *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-0279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021) ($97,500.00). These cases are not easily comparable, however, because each featured less severe pain, steroid injections before and after surgery, and lengthy treatment gaps. As stated in *Shelton*: "the fact that Petitioner could cope with her injury for such a long period of time counsels in favor of a lower pain and suffering award. Treatment gaps are a relevant consideration in determining the degree of Petitioner's pain and suffering." *Shelton* at *7. In comparison, Mr. Richardson had more severe pain leading up to and while recovering from surgery, with no steroid injections and no significant gaps in treatment.

11

Petitioner's case is, however, "nearly identical to that in" another of Petitioner's cited comparable cases - *Moore v. Sec'y of Health & Hum. Servs.*, No. 19-1850V, 2022 WL 962524 (Fed. Cl. Spec. Mstr. Feb. 25, 2022) (awarding $115,000.00 for actual pain and suffering). Brief at 6. Petitioner argues that his own pain was more severe, thereby justifying a higher award (Brief at 6-7), while Respondent proposes that the "four-month treatment gap early in [the *Moore* petitioner's] treatment course makes it an overall unsuitable comparator," Response at 11. Both parties omit one important fact: the *Moore* petitioner's treatment gap was preceded by an initial course of formal PT (6 sessions) and a cortisone injection – which can often deliver temporary relief of SIRVA pain. But otherwise, I accept *Moore* as a useful comparable (although it illustrates why Petitioner's demand is too high).

This case is also comparable to another case not cited by the parties. *Wylie v. Sec'y of Health & Hum. Servs.*, No. 20-1314V, 2022 WL 17968929, *6 (Fed. Cl. Spec. Mstr. Nov. 4, 2022). There, I determined that the SIRVA was moderate, featuring surgery but followed by an "excellent and swift" recovery within ten months – and thus warranting an actual pain and suffering award of $108,000.00.

Based on the parallels to *Moore* and *Wylie*, and the facts in this case, I find that an appropriate award for Mr. Richardson's actual pain and suffering is $112,000.00.

## Conclusion

I award Petitioner a lump sum payment of **$112,000.00 for actual pain and suffering.**[10] This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[11]

**IT IS SO ORDERED.**

                                                  **s/Brian H. Corcoran**
                                                  Brian H. Corcoran
                                                  Chief Special Master

---

[10] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.